# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 00-1646

_____

| | | |
|---|---|---|
| Avemco Insurance Company, | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| | * | |
| v. | * | |
| | * | |
| Auburn Flying Service, Inc.; Ruth | * | |
| Norvell, Personal Representative of | * | |
| the Estate of Fred E. Farington, | * | |
| Deceased; | * | |
| | * | Appeal from the United States |
| Defendants/Appellants, | * | District Court for the District of |
| | * | Nebraska. |
| Brian L. Smith, Co-Personal | * | |
| Representative of the Estate of | * | |
| Vera Mae Smith, Deceased; Janelle | * | |
| Briner, Co-Personal Representative | * | |
| of the Estate of Vera Mae Smith, | * | |
| Deceased; Laverne Norvell, Personal | * | |
| Representative of the Estate of | * | |
| Augusta Norvell, Deceased; Edward | * | |
| Drillon; Cheryl Bevirt, Personal | * | |
| Representative of the Estate of | * | |
| Edward DeBourbon, Deceased, | * | |
| | * | |
| Intervenors/Defendants/ | * | |
| Appellants. | * | |

_____

Submitted: October 23, 2000

Filed:  March 13, 2001

_____

Before WOLLMAN, Chief Judge, LAY, and BEAM, Circuit Judges.

_____

BEAM, Circuit Judge.

Avemco Insurance Company (Avemco) filed a declaratory judgment action to determine if coverage for an accident existed under a noncommercial aviation policy it had issued to Auburn Flying Services, Inc. (AFS).  The defendant/appellant is the personal representative of the estate of the deceased pilot and the intervenors are the personal representatives of the estates of the three passengers killed in the accident (collectively appellants).  The district court[1] granted Avemco's motion for summary judgment.  We affirm.

## I.    BACKGROUND

The relevant facts of this case are as straightforward as they are tragic.  On October 5, 1997, several organizations conducted a "fly-in" at the Auburn airport, near Auburn, Nebraska.  As part of the event, attendees could pay $10 for a ten- to fifteen-minute airplane ride around the Auburn area in a plane piloted by Fred Farington.  The money was collected at a table near the runway, which had a sign near it advertising the plane rides.

_____

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

On the ninth trip of the day, while attempting to land, the plane struck a passing semi tractor-trailer and crashed. The three airplane passengers died in the crash. Farington died from his injuries four months later. The parties have stipulated that the money collected by Farington was not sufficient to cover the operating expenses of the flights.

Appellee, Avemco, had issued a noncommercial liability insurance policy to AFS, covering the plane in question. Farington was president of AFS, and was covered by name under the policy when piloting the plane.

The policy contained the following exclusion of coverage: "This policy does not cover bodily injury, property damage, or loss . . . [w]hen your insured aircraft is . . . used for a commercial purpose." The policy contained the following definition:

> "Commercial purpose" means any use of your insured aircraft for which an insured person receives, or intends to receive, money or other benefits. It does not include:
>
> a. the equal sharing among occupants of the operating costs of a flight.

After receiving evidence the district court granted Avemco's motion for summary judgment. Defendants and intervenors filed this appeal.

## II.    ANALYSIS

We review a grant of summary judgment de novo. Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993). We view the facts in a light most favorable to the nonmoving party. Id. Summary judgment may only be granted if there are no disputes concerning material facts and the moving party is entitled to judgment as a matter of law. Id.

-3-

In interpreting this insurance policy, we apply the law of Nebraska.  See Langley v. Allstate Ins. Co., 995 F.2d 841, 844 (8th Cir. 1993).  Nebraska law provides:

> An insurance policy is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. . . . The resolution of an ambiguity in a policy of insurance turns not on what the insurer intended the language to mean, but what a reasonable person in the position of the insured would have understood it to mean at the time the contract was made.

Malerbi v. Central Reserve Life, 407 N.W.2d 157, 162-63 (Neb. 1987) (internal citations omitted).

> The parties to an insurance contract may contract for any lawful coverage, and an insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract not inconsistent with public policy or statute. . . . Where the terms of [an insurance] contract are clear, they are to be accorded their plain and ordinary meaning.  The language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them.  When an insurance contract can fairly be interpreted in more than one way, there is ambiguity to be resolved by the court as a matter of law.  An ambiguous insurance contract will be construed in favor of the insured, but ambiguity will not be read into insuring language which is plain and unambiguous in order to construe it against the preparer of the contract.  In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous.

American Family Ins. Group v. Hemenway, 575 N.W.2d 143, 148 (Neb. 1998) (internal citations omitted).

We have found no case from the Nebraska Supreme Court interpreting similar language from an insurance contract.[2] Therefore, in predicting how that court would decide this case, we follow its lead and examine precedent from other jurisdictions. See, e.g., id. at 149 (surveying how other courts have interpreted a "regular use" exclusion in auto insurance policies); Mendenhall v. Grantzinger, 546 N.W.2d 775, 778 (Neb. 1996) (analyzing cases from other jurisdictions to determine whether an automatic coverage clause in an automobile insurance policy was ambiguous).

Appellants argue that the "commercial purpose" exclusion in the policy is ambiguous and in support cite several cases from other jurisdictions which have held that "for a charge" and "for a fee" exclusions in similar non-commercial airplane policies were ambiguous.[3] We find this argument unpersuasive and find the contract to be unambiguous.[4]

The cases cited by appellants do not govern this policy because those cases interpreted "for charge" exclusions, which did not contain any type of "shared

---

[2]In fact, the parties agree that they can find no case from any jurisdiction interpreting the precise contractual language involved in this dispute.

[3]The precise language in the various policies varies in form, but not in substance. We will refer to them collectively as "for charge" exclusions. "Exclusion" refers to a clause in the policy that would eliminate coverage. "Exception" refers to an exception to the exclusion that would restore coverage.

[4]Appellants also seem to assert that we must consider the reasonable expectations of the insured in deciding whether a policy is ambiguous. Under Nebraska law, we would only consider reasonable expectations if the contract language was first found to be ambiguous. See Safeco Ins. Co. v. Husker Aviation, Inc., 317 N.W.2d 745, 748 (Neb. 1982).

expense" exception to that exclusion.[5] The commercial purpose exclusion in the present policy contains an explicit exception for shared expense flights. "'In construing an insurance contract, the court must give effect to the instrument as a whole and, if possible, to every part thereof.'" Polenz v. Farm Bureau Ins. Co., 419 N.W.2d 677, 680 (Neb. 1988) (quoting Cordes v. Prudential Ins. Co., 150 N.W.2d 905, 908 (Neb. 1967). Thus, even if the exclusion in this policy was ambiguous concerning shared expense flights when read in isolation, any such ambiguity is removed by the exception for "the equal sharing among occupants of the operating costs of a flight."[6]

Finding the policy unambiguous because of the "shared expense" exception is further supported by the outcomes of the cases cited by appellants. When faced with an ambiguous "for charge" exclusion, the courts remedied the ambiguity by holding that if the money exchanged only covered the expenses of a flight then the exclusion did not apply. For example, in Flagstaff Mortuary, Inc. v. Gamble, the court held that as a matter of law, if the money paid for use of an airplane exceeded the direct operating costs of the flight, the "for charge" exclusionary clause applied precluding coverage. 662 P.2d 149, 151 (Ariz. Ct. App. 1983); see also Monarch Ins. Co. v.

---

[5]Only two cases mention a shared expense exception in the insurance contract. See Pacific Indem. Co. v. Acel Delivery Serv., Inc., 485 F.2d 1169, 1172 (5th Cir. 1973); Thompson v. Ezzell, 379 P.2d 983, 987 (Wash. 1963). Appellants cite Thompson as the best statement of the interpretation/ambiguity problem inherent in the "for charge" policies. A closer examination of that case reveals that the court was interpreting a policy similar to the one at hand, which contained a "for charge" exclusion and an exception to the exclusion for a "shared expense" flight. See Thompson, 379 P.2d at 987.

[6] We express no opinion as to whether this exclusion, standing alone, may be ambiguous according to the reasoning of the "for charge" cases. We merely note that under Nebraska law each case must be determined "upon the wording of the exclusionary clause in the policy and the special facts therein." Pimper v. National American Fire Ins. Co., 296 N.W. 465, 467 (Neb. 1941).

Siegel, 625 F. Supp. 693, 699 (N.D. Ind. 1986) (holding that a "for charge" exclusion applies whenever the money received exceeds the direct operating costs of a flight); Cammack v. Avemco Ins. Co., 505 P.2d 348, 350 (Or. 1973) (holding that a "for charge" exclusion did not apply where the money paid was just a reimbursement of expenses in a noncommercial context). In effect these cases have created an implicit exception to "for charge" exclusions, which restores coverage where the charge only covered expenses. In the present case, the policy's plain language already achieves the same result.

Since the exclusionary clause is not ambiguous, its interpretation is a question of law for this court. See American Family, 575 N.W.2d at 148. Our task is to determine the difference between a receipt of money for use of the aircraft and an equal sharing of operating costs. Thompson, 379 P.2d at 987 (stating "the issue only revolves about a differentiation between 'a charge' and 'share expense'").[7]

In interpreting an exclusionary clause, one important consideration is the general purpose of the clause. Id.; cf. American Family, 575 N.W.2d at 147-48 (referring to the general purpose behind "regular use" exclusions in automobile liability policies while interpreting such an exclusion). We agree with the Washington Supreme Court that the difference in risk between these two types of flights ("for charge" or "shared expense") lies in the frequency of flights. The purpose of the exclusionary clause is to reduce that risk by limiting the total number of flights. Thompson, 379 P.2d at 987. The receipt of money, or some other benefit, for the use of an airplane provides additional impetus or motivation for making the flight, and is thus likely to increase the

_____

[7]Although the policies in the cases interpreting "for charge" exclusions contained no explicit "shared expense" exception, they are helpful in this inquiry. Once the courts held that a "for charge" exclusion was ambiguous and carved out an implicit "shared expense" exception that restored coverage, the courts still had to determine the difference between the two.

number of flights an insured will make.[8] Id. See also American Cas. Co. v. Eagle Star Ins. Co., 568 P.2d 731 (Utah 1977). On the other hand, a "shared expense" flight suggests a common interest in the flight, other than the interest in making the particular flight. Thompson, 319 P.2d at 987.

Several court have found dispositive the relationship of the money paid to the direct operating expenses of the flight. See Flagstaff, 662 P.2d at 151 (holding that where evidence showed payment far in excess of direct fuel expenses and close to the standard commercial charter rate, the insurer was entitled to summary judgment); Monarch Ins., 625 F. Supp. at 699-700 (holding that an hourly charge in addition to paying for gas and oil was clearly a flight "for charge"). Other courts have noted that if there is some quid pro quo (if the motivating factor for the flight was the fee) then the flight is "for charge" rather than "shared expense." See Pacific Indem. Co. v. Acel Delivery Serv., Inc., 485 F.2d 1169, 1172 (5th Cir. 1973). If the payment is completely voluntary, then no quid pro quo exists, and a payment that just covers a portion of the fuel expense is not excluded by the "for charge" clause. See Houston Fire and Cas. Ins. Co. v. Ivens, 338 F.2d 452, 455 (5th Cir. 1964). The factors relied upon in these cases are relevant to our inquiry, but no single factor is dispositive.

We hold that in interpreting an insurance exclusion clause, like the one in this case, the relevant inquiry is whether a reasonable person, viewing the totality of the circumstances surrounding the arrangement, would conclude that the arrangement was one of "shared expenses" or a flight made for the receipt of money. See Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co., 698 N.E.2d 770, 775-76 (Ind. 1998) (relying on a

---

[8]We do not go so far as to say that there must be a profit motive for the flight as the Thompson court seems to indicate, and for which the appellants argue. See also Pacific Indem., 485 F.2d at 1172 (holding that for charge language implies some quid pro quo, but quid pro quo does not necessarily mean that the insured must have a profit motive).

similar standard in interpreting an automobile policy with a "for charge" exclusion and a "shared car pool expense" exception);  cf. Mendenhall, 546 N.W.2d at 775 (holding that in order to determine if a newly purchased vehicle was covered under a policy's automatic coverage clause, the inquiry is whether a **reasonable person** would have thought the vehicles already owned by the insured were in such a condition of inoperability that the insured would not have included them in a policy of liability insurance) (emphasis added).[9]

The factors a reasonable person would examine would include those mentioned in the previous aviation policy cases:  relationship of the amount paid to the expenses of a flight, existence of  a community interest in taking the flight other than the flight itself, voluntariness of the payment and any indication of a quid pro quo.  In automobile cases interpreting similar insurance contracts, courts have clearly followed a totality of the circumstances standard and taken a more comprehensive  approach than the cited aviation insurance cases in considering all of the factors relevant to distinguishing "for

---

[9]We look to cases interpreting automobile liability policies with "for charge" exclusions and "shared car pool expense" exceptions because noncommercial aviation policies are often similar in structure and follow the same general pattern.  See Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 1:49 (3d ed. 1997).  We acknowledge that these cases are not perfectly analogous, particularly since 'car pool' bears a meaning specific to the auto policies.  However, the similar issues in construing the two types of policies allow us to take direction from the standards and approaches courts have developed in interpreting these automobile policies.  The totality of the circumstances approach has a long pedigree in automobile insurance cases.  See, e.g., State Farm Mut. Auto. Ins. Co. v. Self, 93 F.2d 139, 140 (5th Cir. 1937) ("[C]ourts, in determining whether or not such payment amounts to a 'consideration' for the carrying, take into account not only the payment of the money, but all the attending circumstances"); Beer v. Beer, 16 N.E.2d 413, 417 (Ohio 1938) (holding that where parties made trip for mutual interest, pleasure or benefit, coverage is not excluded as being carrying of passengers for compensation).

charge" from "shared expense" arrangements.  See, e.g., Meridian Mut., 698 N.E.2d at 775.

For example, in Meridian Mutual the court considered whether the driver held herself out as providing transportation to the general public or just to a small group of people whose participation in the car pool generally did not change; whether there was significant formality in the arrangement between the driver and the passengers; whether the driver had some purpose in making the trip other than carrying the passengers (such as going to work herself); and whether the driver used the vehicle for her own personal use at other times.[10]  Id. at 776; see also Johnson v. Allstate Ins. Co., 505 So.2d 362, 367 (Ala. 1987) (stating that the significant factors are whether the insured charged a definite amount, whether the amount was proportionate to actual expenses of the trip, whether payment was voluntary (or paid as consideration for the trip) and whether the driver and passengers were engaged in some common enterprise).[11]

---

[10]The Indiana Supreme Court mentions these factors as being indicative of the driver's primary motivation for making the trip.  We believe their relevance goes beyond inferences of the driver's intent. We believe they are the factors a reasonable person would examine when deciding whether an arrangement is "for charge" or "shared expense" aside from what they may indicate about the driver's intent.

[11]We recognize that the Seventh Circuit has indicated some factors, such as voluntariness of the payment or existence of a quid pro quo, are not helpful or relevant in determining if an arrangement was for a charge or shared expenses. General Accident Ins. Co. v. Gonzales, 86 F.3d 673,  676 n.4 (7th Cir. 1996).  For example, the court noted that even in shared expense arrangements there is a sense in which the payment is not voluntary because  payment of one's share of the expenses may be a condition for participating in the flight.  We agree that an involuntary payment does not automatically mean that the arrangement was "for charge."  However, if a payment were entirely voluntary, as it was in Houston Fire, 338 F.2d at 455, we think that would almost certainly mean that the arrangement was a sharing of expenses.  Therefore, a reasonable person could consider such factors while keeping in mind that they do not afford conclusive (or even necessarily strong) evidence in many cases.

In examining these factors under a totality of the circumstances standard, courts have generally found that where the arrangement is among persons with a common purpose, where participation in the arrangement is limited to a small group of people, and where the driver would have made the trip in question anyway, the arrangement is a covered "shared car pool expense." Meridian Mut., 698 N.E.2d at 775 (stating that a woman who used her van to transport from five to eight co-workers to and from work for a set weekly fee, who testified she was not in the arrangement to make a profit (and there was no indication to the contrary), who did not extend the opportunity to ride in the van pool beyond people she personally knew and who would otherwise have made the trips anyway to get to and from work, was covered by the insurance policy); General Accident Ins. Co. v. Gonzales, 86 F.3d 673 (7th Cir. 1996) (same); Aetna Cas. and Sur. Co. v. Mevorah, 566 N.Y.S.2d 842, 845 (N.Y. Sup. Ct. 1991) (same); see also Thompson, 379 P.2d at 987.

The appellants argue that evidence of Farington's intent to use the money to defray costs creates a question of fact unsuitable for disposition at summary judgment. While we think that this is relevant to our inquiry, it does not create a question of fact because we assume, favorably to appellants, that he did have such an intent. However, aside from Farington's intent and the stipulation that the money collected did not exceed expenses, all of the other undisputed facts weigh in favor of finding this flight was for receipt of money rather than equally shared expenses.

The depositions of Farington's other passengers reveal that none thought there was any agreement to share expenses, nor that the set $10 amount was only for expenses. Farington and his passengers possessed no community of interest other than just taking the flight itself. By providing these flights in conjunction with the Fly-In's general activities and posting a sign offering anyone a flight in exchange for $10, Farington was holding himself out to provide flights to the general public.

These last two factors (no community of interest and holding himself out to the general public) are the most significant in this case. For example, even if Farington and his passengers did not arrive at a specific agreement that the $10 was to cover expenses, but the passengers were family or friends whom he often took for joy rides (and he only did this with family or friends) then he likely would satisfy the share expense exception. Cf. Cammack, 505 P.2d at 349 (stating that where the insured allowed his uncle and cousin to fly insured's plane in exchange for an hourly fee to cover expenses and also extended this privilege to the uncle's friend, the payment just covered expenses in a noncommercial context). Or, if Farington was going on a vacation with friends and decided to fly them in exchange for a fee that only covered expenses, he would also be covered. See Thompson, 379 P.2d at 987.[12]

## III. CONCLUSION

By offering flights to anyone willing to pay the fee, Farington increased the number of flights he would make with the plane, and increased the risk to the insurer beyond that contemplated in the insurance contract. Consequently, the flight in question was for receipt of money and was not an equal sharing of expenses.

Accordingly, we affirm the decision of the district court.

LAY, Circuit Judge, dissenting.

I respectfully dissent.

---

[12]We decline to address whether payment of a set fee by different numbers of passengers on different flights, or Farington's failure to pay $10 towards expenses on each flight means that the arrangement was not equal under the terms of the contract. Such inquiry is unnecessary to our decision since on the facts of this case the arrangement was not "shared expense" much less "equally shared expense."

-12-

Under the circumstances, I respectfully submit that the result reached by the majority constitutes a gross miscarriage of justice for the families of those passengers who were killed and for the decedent owner and operator of the small plane involved. Under the doctrine of reasonable expectation, it is absurd to think that the owner of the plane did not contemplate full insurance coverage for his non-commercial flights.[13] The owner lost money on the flights in question each time he flew and the facts stipulated clearly show that he did not have a commercial purpose in having passengers share in a token expense for the flight.

The majority has now construed the insurance policy in such a wooden way as to find forfeiture of a non-commercial policy of insurance which the owner purchased to cover his injury or death and that of his passengers. This unreasonable interpretation defies every principle of construction governing insurance policies long given adherence by the Nebraska Supreme Court.

First of all, it is well-settled under Nebraska law that exclusionary clauses will be liberally construed in favor of the insured. Modern Sound & Systems, Inc. v. Federated Mutual Ins. Co., 262 N.W.2d 183, 187 (Neb. 1978). Second, it is clear under Nebraska law that forfeitures are not favored. See Rathbun v. Globe Indem. Co., 184 N.W. 903, 904-05 (Neb. 1921). For over a century, Nebraska law has recognized that forfeitures which are against equity and good conscience or are absurd from the standpoint of the contract to give protection will not be enforced. See Connecticut Fire Ins. Co. v. Jeary, 83 N.W. 78, 79 (Neb. 1900). Couch has expressed this holding by stating "that in cases where it is doubtful that a forfeiture provision was intended, the

_____

[13]See Decker v. Combined Insurance Co. of America, 505 N.W.2d 719, 722 (Neb. 1993) ("An insurance policy should be interpreted in accordance with reasonable expectations of the insured at the time of the contract. A contract of insurance should be given a reasonable construction so as to effectuate the purpose for which it was made. In cases of doubt, it is to be liberally construed in favor of the insured.") (quoting Neal v. St. Paul Fire & Marine Ins. Co., 250 N.W.2d 648 (Neb. 1977)).

-13-

interpretation will be against a forfeiture." Couch on Insurance 3d § 22:35 (1995) (citing Hilmer v. Western Travelers' Accident Ass'n., 125 N.W. 535 (Neb. 1910)). Couch further states "[s]ince forfeitures are not favored, the courts are usually inclined to take hold of any extrinsic circumstance which indicates an election to waive a forfeiture or which precludes the insurer under principles of estoppel from enforcing the forfeiture." Id. at § 22:36. Third, contrary to the law in Nebraska and all other jurisdictions, the majority here ignores the fundamental principle that an ambiguous insurance policy is to be construed against the insurer. See American Family Ins. Group v. Hemenway, 575 N.W.2d 143, 148 (Neb. 1998); Safeco Ins. Co. of Am. v. Husker Aviation, Inc., 317 N.W.2d 745, 748 (Neb. 1982). The majority avoids this principle by use of an indefensible construction, ignoring an obvious ambiguity in the insurance policy.

The premise underlying the majority's analysis is that the commercial purpose clause is not ambiguous because it is expressly defined within the policy. In all due respect, the majority's opinion fits the old adage "saying so don't make it so." A Dictionary of American Proverbs 526 (Wolfgang Mieder et al. eds., 1992). The majority's declaration that the policy terms are not ambiguous does not cure the latent ambiguity in those terms, *which arises when applied to the facts of this case*.

The policy at issue excludes coverage when the insured aircraft is used for a "commercial purpose." Commercial purpose is defined as any use of the aircraft for which an insured person "receives, or intends to receive, money or other benefits." According to the policy, this exclusion does not operate where the aircraft's occupants equally share the operating expenses of the flight. The obvious interpretation of "commercial" purpose relates to the owner making a profit from the flight. It is stipulated by the parties that no profit was made here.

To predict whether the Nebraska Supreme Court would find the commercial purpose clause ambiguous, the majority looks to other jurisdictions that have examined

"for charge" exclusions. However, the reasoning the majority employs to reach its desired result is tenuous, at best.[14] The majority cites cases that hold where money paid by passengers *exceeds* operating costs, a "for charge" exclusion clause applies and precludes coverage. It also cites cases that hold where money paid by passengers *equals* expenses, a "for charge" exclusion does not apply and coverage is proper. Based on these authorities, the majority concludes that the commercial purpose clause is not ambiguous and must be enforced according to the plain meaning of its terms. However, none of the cases cited by the majority incorporate the facts of this case, where the passengers paid *less than* the operating expenses of the flight. Herein lies the latent ambiguity which the majority overlooks. See Plambeck v. Union Pacific R.R. Co., 509 N.W.2d 17, 20 (Neb. 1993) ("Although the language of a document may be clear and unambiguous, a latent ambiguity exists when collateral facts make the meaning of the contract uncertain."); Couch on Insurance 3d § 21.12 ("A latent ambiguity exists where uncertainty appears in the application of the contract to the object thereof, although the policy read by itself would otherwise be clear.").

---

[14]In addition to the primary difference I have with the majority's opinion, I also find it internally inconsistent. For instance, the majority suggests that only cases with both a "for charge" exclusion and a "shared expense" exception to that exclusion are apposite to the case at hand. See Slip Op. at 5-6 ("The cases cited by appellants do not govern this policy because those cases interpreted 'for charge' exclusions, which did not contain any type of 'shared expense' exception to that exclusion."). It then goes on to rely on the conclusions set forth in cases that do not contain an explicit "shared expense" exception to a "for charge" exclusion. See Monarch Ins. Co. of Ohio v. Siegel, 625 F. Supp. 693 (N.D. Ind. 1986); Cammack v. Avemco Ins. Co., 505 P.2d 348 (Or. 1973); Flagstaff Mortuary, Inc. v. Gamble, 662 P.2d 149 (Ariz. Ct. App. 1983). The majority also explains how courts have remedied ambiguity in "for charge" exclusion cases. See Slip Op. at 6-7. Based on the outcomes of those cases, the majority concludes that the terms in the instant policy are *not* ambiguous. This is circular reasoning that lacks congruence. To adopt the interpretations in the cases that are faced with "an ambiguous 'for charge' exclusion," id. at 6, it seems we first would have to embrace the central premise of those cases: the terms and phrases at issue are ambiguous.

The majority also reasons that any ambiguity in the commercial purpose clause is cured when it is read together with the equal sharing provision. The equal sharing provision defines what is *not* a commercial purpose. In other words, the majority defines a positive (commercial purpose) with a negative (not equal sharing). That syllogism does not preclude the possibility that the commercial purpose clause is ambiguous.

Obviously there can be more than one meaning given to "commercial purpose." Under the terms of the policy, although the commercial purpose exclusionary clause is inoperable where there exists equal sharing of operating expenses, it makes no sense to argue that where there is less than equal sharing in expenses by the occupants, this constitutes a commercial purpose simply because it is not specifically expressed in the policy. If sharing of expenses makes the exclusion inoperable, the only reasonable construction is that anything less than sharing of operative expenses would also make the exclusionary clause inoperable. The majority's reasoning rests upon a false premise that every flight is deemed commercial unless there is an equal sharing of operating expenses. It makes little sense to urge that unless there exists equal sharing of expenses all other flights are deemed to be commercial. Under Nebraska law, the terms of coverage must rely upon the ordinary meaning of the words uses. See Preferred Risk Mut. Ins. Co. v. Continental Ins. Co., 109 N.W.2d 126, 127-28 (Neb. 1961). Webster's Dictionary defines "commercial" as "from the point of view of profit: having profit as the primary aim." Webster's Third New International Dictionary 456 (1981).

In the instant case, "[t]he parties have stipulated that the money collected by Farington was not sufficient to cover the operating expenses of the flights." Slip Op. at 3. The policy's equal sharing provision does not apply to this case because

Farington expended more for the flights than he collected from his passengers.[15] That does not mean that Farington had a commercial purpose by default. The question remains whether, in collecting less money for the flight than he expended, Farington received, or intended to receive, money or other benefits. The majority's construction of the exclusionary terms places particular emphasis on the physical act of receiving money. In other words, the simple fact that Farington (or his wife, in this case) physically took money from passengers (that did not amount to a pro rata share of operating costs) brought this case under the commercial purpose clause of the contract. Taking this interpretation to its logical conclusion, Farington could have collected as little as one cent from each passenger and thus be precluded coverage by that act. Such an interpretation is far beyond the purpose of the exclusionary clause. A second, but equally reasonable reading of this policy, is that the commercial purpose clause only is triggered where the insured receives in fact, or intends to receive, more money or other benefits than he expends for the flights.[16] The logical conclusion of this

---

[15]The equal sharing provision applies where the aircraft's "occupants" equally share operating costs of the flight. An occupant is defined as "a person while in, on, or getting into or out of" the aircraft. In other words, the pilot is an occupant. Farington's passengers equally shared expenses in that they paid $10 each for the ride, but their contributions did not cover the operating expense of the flight. This means that Farington, an occupant, assumed more than his equal share of operating costs.

[16]The majority's opinion concedes the reasonability of this interpretation by virtue of the cases it cites that analyze similar "for charge" exclusions. See Monarch, 625 F. Supp. at 699 (holding that a "for charge" exclusion applies whenever the money received exceeds the direct operating costs of a flight); Cammack, 505 P.2d at 350 (holding that a "for charge" exclusion does not apply where money paid reimbursed expenses in a noncommercial context); Flagstaff, 662 P.2d at 151 (holding that as a matter of law, if the money paid for use of an airplane exceeds the direct operating costs of the flight, the flight was made "for a charge;" the court expressed doubt that if the money constituted a mere reimbursement of expenses that the flight would be "for a charge.").

interpretation is that because he recovered less than he expended for the flights, Farington clearly did not have a commercial purpose.

According to the majority's reasoning, if the occupants did not equally share in the expenses, but did pay less than the expenses (as stipulated), then it is still a commercial purpose because payment of less than the expenses did not strictly conform to the coverage provided when equal expenses are paid. This constitutes a totally unreasonable interpretation. It means if the occupants share expenses, there is coverage because there is no charge and thus, commercial usage is not involved. But if the occupants pay less than expenses, a commercial use takes place. This makes little sense and defies every rule of reasonable construction. The majority ignores the obvious ambiguity and by implication borrows from the old maxim of construction, *expressio unius est exclusio alterius*. The Supreme Court, however, has long abandoned the use of such maxim in a comparable situation, saying "the maxim cannot properly be applied to a situation where the remedies redress *different misconduct* and where the remedial purposes of the Acts *would be undermined by a presumption of exclusivity*." Herman & MacLean v. Huddleston, 459 U.S. 375, 387 n.23 (1983) (emphasis added).

The majority's opinion appears to resolve this case on grounds that there is no patent ambiguity in the exclusionary clause. See Couch on Insurance 3d § 21:12 ("A patent ambiguity is one which appears on the face of the written contract of insurance."). A closer look reveals that things are not always what they seem. "The mere fact that a particular contract is found to be unambiguous in connection with one type of loss does not preclude a court from finding that it is ambiguous in the context of a totally different type of loss." Id. § 21:11. Thus, the mere fact that the policy is not ambiguous when applied to situations where passengers pay equal to or more than their share of operating expenses does not save it from ambiguity in this case, where the passengers paid less than their share of operating expenses. This ambiguity cannot be ignored.

-18-

Language should not be tortured to find ambiguities in a contract. See Swedberg v. Battle Creek Mut. Ins. Co., 356 N.W.2d 456, 458-59 (Neb. 1984). It is equally important that language not be tortured to *avoid* ambiguity. I respectfully submit that to avoid ambiguity in this case the majority has tortured the terms of this contract by confining the language in a way that a reasonable person might not. A fair reading of this contract from the standpoint of a reasonable person purchasing insurance reveals more than one interpretation. One reading precludes coverage and the other reading mandates coverage. Given this ambiguity, under Nebraska law we must construe the policy against the insurer. See Safeco, 317 N.W.2d at 748.

There is another reason which causes me to disagree with the majority's opinion. In affirming the district court's order for summary judgment, the majority allegedly gives cognizance to well-accepted principles of contract interpretation espoused by the Nebraska Supreme Court. However, for over a century the Nebraska Supreme Court also has recognized that "words are to be taken in their ordinary grammatical sense *unless such a construction would be obviously repugnant to the framers of the instrument, or would lead to some other inconvenience or absurdity.*" Curten v. Atkinson, 54 N.W. 131, 133 (Neb. 1893) (emphasis added); see also Murphy v. Travelers Ins. Co., 2 N.W.2d 576, 581 (1942) ("This court is committed to the rule that, when the strict enforcement of a provision of an insurance policy will result in unreasonable and unjust forfeitures, or an absurd result, the courts will refuse to enforce the strict meaning of the language of the policy."); Couch on Insurance 3d § 22:35 (noting the general rule that forfeitures of insurance coverage are not favored in the law and that those which "are absurd from the standpoint of the purpose of the contract to give protection are not to be enforced."). The Supreme Court agrees. See Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 322 (1928) ("[N]arrow and unreasonable interpretations of clauses in an insurance policy are not favored."). Thus, while terms in a contract ordinarily should be given their plain, natural and ordinary meaning, that rule does not operate if it leads to an unreasonable or absurd result or if it defeats the

-19-

parties intention and purpose in entering into the contract. See Rathbun, 184 N.W. at 905 (Neb. 1921).

Rules of contract construction, though useful guidelines, do not operate in a vacuum and must not trump logic and common sense in a court of law. Despite the academic framework set forth in the majority's opinion, it not only seems absurd, but it also defies common sense to conclude that Farington received, or intended to receive, money or other benefits when the bottom line says he received nothing at all. According to the majority's reading of the policy's plain terms, Farington would have had to calculate each passenger's share of operating costs to a mathematical certainty in order for coverage to exist. This would be nearly impossible and would defeat coverage in almost every instance where Farington's passengers contributed to the operating expenses of the flight, no matter how small the amount.

Whether the policy is analyzed in terms of ambiguity or in terms of the unreasonable result it imposes, I come to the inescapable conclusion that summary judgment was inappropriate in this case. Accordingly, I would reverse and remand for further proceedings.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-20-